### ALLEN v. OKLAHOMA CITY et al.

No. 26152. Nov. 26, 1935.

Rehearing Denied Jan. 7, 1936.

Jack W. Page, for plaintiff in error.

Harlan Deupree, Municipal Counselor, Ralph J. May, Asst. Municipal Counselor, and Martin V. Milam, for defendants in error.

RILEY, J. The plaintiff below, plaintiff in error, sought by this action injunctive relief to prevent enforcement of ordinance No. 4524, city of Oklahoma City, commonly known as the "Segregation Ordinance."

Under the provisions of section 1 of the ordinance it is unlawful for any white person to occupy, as a residence, any house or building located in a block wherein a majority of the lots used as residences are occupied by Negroes. Under the provisions of section 2, it is unlawful for any Negro to occupy as a residence any house or building located in a block wherein a majority of the lots used as residences are occupied by white persons. Section 11 provides the penalty and specifies that each day's continued occupation as prohibited shall constitute a separate offense.

The ordinance is prospective. By its terms it is expressly nonapplicable to persons residing in prohibited areas prior to the date of enactment.

Subsequent to the effective date of the ordinance, plaintiff, a Negro, purchased lots 7 and 8, block 22, Oak Park addition to the city of Oklahoma City. Thereafter she commenced living in the residence so located, and has continued to reside therein. Block 22 is an area in which the majority of residences located upon lots of the block are occupied by white persons.

Shortly prior to the institution of this action plaintiff was given written notice by authorities of the city, of her violation of the ordinance, and ordered to vacate the premises so owned and occupied by November 13, 1934. Upon her failure so to do, a complaint was filed in the municipal court, wherein plaintiff was charged with violation of this ordinance. A warrant was issued for her arrest. Thereupon this action was instituted and a temporary restraining order was issued.

The plaintiff alleged and contended below that the ordinance in question is void; that it is repugnant to and in violation of the Fourteenth Amendment to the Constitution of the United States; that unless defendants are enjoined from enforcing the ordinance plaintiff would suffer irreparable

damage and injury; that she has no adequate relief at law.

The judgment below denied plaintiff's prayer for temporary injunction. Motion for new trial was overruled, and plaintiff has perfected an appeal.

This court adheres to the rule heretofore announced that "Equity will restrain by injunction a proceeding under an invalid ordinance which, if allowed to proceed, would destroy property rights and effect irreparable injury."

In N. Y. Life Ins. Co. v. Town of Comanche, 62 Okla. 47, 162 P. 466, it was held that criminal proceedings under an invalid ordinance may be restrained where proceedings under the ordinance would inflict irreparable injury or destroy property rights. Yale Theater v. City of Lawton, 35 Okla. 444, 130 P. 135. But where, under enforcement of the ordinance, there is no destruction of property rights or infliction of irreparable injury, an appeal from a judgment sustaining the criminal proceedings affords an adequate relief. Golden v. City of Guthrie, 3 Okla. 128, 41 P. 350; Thompson v. Tucker, 15 Okla. 486, 83 P. 413.

In the case at bar, unless enforcement of the ordinance in question is enjoined, plaintiff will be required, either to cease occupying the residence owned by her, or to suffer liability of arrest each day pending final determination, in an action at law, of the validity of the ordinance in question. In view of the written notice of intention to enforce the ordinance, proceedings leading to that end and provisions of the ordinance constituting each day's continued occupancy as prohibited a separate offense, and assuming invalidity of the ordinance, it is apparent that plaintiff has established a threatened and impending invasion of her property rights, a resulting irreparable injury, and a consequent inadequacy of remedy at law.

This court held in the case of Nation v. Chism, 154 Okla. 50, 6 P. (2d) 766:

"Under the provisions of section 2, art. 2, of the Constitution of Oklahoma, all persons have the inherent right to life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry. Where an attempt is made by any individual, without lawful authority, to deprive them of any of those rights, the courts of justice of this state are open to them, and speedy and certain remedy must be afforded them for such a wrong."

This court has followed the greater weight of authority and the better reasoned cases that hold:

"Where a municipal ordinance is void and its provisions are about to be enforced, or are being enforced, any person who is injuriously affected thereby, either in his person or the use of his property, may go into a court of equity to have the enforcement of the ordinance stayed by injunction." Fitzhugh v. Jackson et al. (Miss.) 97 So. 190, 33 A. L. R. 279; Yeegee v. City and County of San Francisco (D. C.) 235 Fed. 757.

We are, therefore, of the opinion that the court below should have considered the validity of the ordinance in question, and its judgment should have afforded or denied plaintiff relief accordingly.

The question as to the validity of the ordinance involved is no longer an open one.

The Supreme Court of the United States in the case of Buchanan v. Warley, 245 U. S. 60, 62 L. Ed. 149, construed and condemned, in the year 1917, an ordinance enacted by the city of Louisville, Ky., identical with the one presented in the cause at bar. The decision was unanimous, and thereafter, and in the year 1918, the Supreme Court of Virginia was called upon to pass upon the validity of a segregation ordinance such as the one now under consideration, and the Supreme Court of Virginia in the case of Irvine v. City of Clifton Forge, 97 S. E. 310, in conforming their previous contrary holding to the view of the Supreme Court · of the United States, said, in reference to the decision in Buchanan v. Warley, "The opinion of the court fully covers the case at bar."

The question arose again in the state of Louisiana in the year 1925. The city of New Orleans passed an ordinance providing for the segregation of the residences of white and colored persons. The Supreme Court of Louisiana upheld the ordinance and declined to follow the rule of law enunciated by the Supreme Court of the United States. Tyler v. Harmon (La.) 107 So. 704. An appeal was taken to the Supreme Court of the United States and therein the judgment of the Supreme Court of Louisiana was reversed with these brief words (Harmon v. Tyler, 71 L. Ed. 831):

"Per Curiam. Reversed on authority of Buchanan v. Warley, 62 L. Ed. 149."

Again in the year 1932, the Supreme Court of the United States had occasion to pass upon the validity and constitutionality of a segregation ordinance such as the one now under consideration. This was in the case

of City of Richmond v. Deans, 281 U. S. 704. It appears that the city of Richmond passed an ordinance which was unique, if not evasive; it prohibited any person using as a residence any building in a block where the majority of the residences in such block were occupied by those with whom said person is forbidden to intermarry by virtue of section 5 of the Act of the General Assembly of Virginia (Acts 1924, c. 371), under which a Negro person and a white person were prohibited from intermarrying. One J. B. Deans instituted an action in the United States District Court for the Eastern District of Virginia to enjoin the enforcement of the city ordinance. The district court ruled that the ordinance was invalid as being violative of the Fourteenth Amendment to the federal Constitution. The city of Richmond appealed to the Circuit Court of Appeals of the Fourth Circuit, and that court affirmed the lower court, and in so doing employed the following language, 37 Fed. (2d) 712:

"* * * This case is controlled by the decisions of the Supreme Court in Buchanan v. Warley, 62 L. Ed. 149; and Harmon v. Tyler, 71 L. Ed. 831."

Thereafter the city of Richmond appealed to the Supreme Court of the United States, but the Supreme Court adhered to its previous ruling. Again the court made use of unusually terse and brief language (281 U. S. 704):

"Per Curiam. Decree affirmed. Buchanan v. Warley, 62 L. Ed. 149; Harmon v. Tyler, 71 L. Ed. 831."

It thus appears that validity of the ordinance in question is no longer debatable. A federal question is here involved and the highest federal court has repeatedly declined to sustain not only similar ordinances, but as well an ordinance employing identical language, despite contentions based upon similarity to valid provisions for separate schools and separate public conveyances, despite attempts to justify such ordinances under a necessary exercise of the police power and despite support adduced from the underlying principle of zoning ordinances.

The very basis upon which the enactment was predicated (according to testimony), police power, which is the foundation of valid zoning ordinances, was by the Supreme Court stricken and cast aside as a valid supporting principle of the segregation ordinance.

In effect, if not in purpose, that which the city authorities sought to do, expressed in the vernacular, was to select from the discards an ordinance and attempt to find support for it by an appeal to racial prejudice. The respondent city's brief in the companion cases reads:

"The testimony of the witness Dunjee shows the character of this case. It is a concerted effort of certain misguided and misinformed philanthropists to get upon the back of Buchanan v. Warley and ride that case to the destruction of the principles of Plessy v. Ferguson and the Berea College Case. * * *"

The latter cases being those sustaining provision for separate railway accommodations and separate schools. 163 U. S. 537, 41 L. Ed. 256, and 29 S. C. 33. But it must be remembered that neither the beliefs, desires, hopes, faith, racial ambitions, nor economic theories of either philanthropists, witnesses, litigants, lawyers, or judges have any place in a judicial decision except when and if these mental or emotional expressions are written into the law, and facts are presented to the judicial tribunal which require construction and application of that law. Nor can a court of justice properly determine cases by their character. The end to be ever sought by courts is a determination of rights and liberties under law, and when that goal is reached, the result must be declared and enforced though the heavens fall.

These are the words employed in Buchanan v. Warley, supra:

"It is said such legislation tends to promote the public peace by preventing racial conflicts; * * * that it prevents the deterioration of property owned and occupied by white people. * * * The authority of the state to pass laws in the exercise of the police power, having for their object the promotion of the public health, safety, and welfare, is very broad, * * * but it is equally well established that the police power, broad as it is, cannot justify the passage of a law or ordinance which runs counter to the limitations of the federal Constitution. * * * The federal Constitution and the laws passed within its authority are by the express terms of that instrument made the supreme law of the land. The Fourteenth Amendment protects life, liberty, and property from invasion by the states without due process of law. Property is more than the mere thing which a person owns. It is elementary that it includes the right to acquire, use and dispose of it."

The Supreme Court of the United States stated the controversy confronting it. Its statement undoubtedly embraces the issue at bar:

"The concrete question here is, May the

occupancy and necessarily the purchase and sale of property of which occupancy is an incident·be inhibited by the states, or by one of its municipalities solely because of the color of the proposed occupant of the premises?"

The answer was in the negative, and that answer is final, binding, and conclusive as an adjudication upon the subject. The law is the object of our inquiry. Our views on racial problems, political, social, and economic conditions are entirely beside the question.

The federal question grew out of the Civil War, the resulting Emancipation Proclamation and the adoption of the Thirteenth and Fourteenth Amendments to the Constitution of the United States, 'the purpose of which was to give validity to the Emancipation Proclamation.

Mr. Justice Miller, speaking for the Supreme Court of the United States in the Slaughter House Cases, 21 L. Ed. 394, states the reason for the adoption of the amendments. The colored race, having been freed from slavery by the 13th Amendment, was raised to the dignity of citizenship and equality of civil rights; by the Fourteenth Amendment, the states were prohibited from abridging the privileges and immunities of such citizens or depriving any person of life, liberty, or property without due process of law. While the principal purpose of the Fourteenth Amendment was to protect persons of color, the broad language of the amendment used was deemed sufficient to protect all persons, white or black, against discriminatory legislation by the States. This is now the settled law.

Mr. Justice Strong, in Strauder v. W. Va., 25 L. Ed. 664, speaking for the highest federal court, regarding the purpose of the amendment, said:

"It was designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by white persons. * * *"

It is there held:

"The law in the states shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the states, and in regard to the colored race for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color."

In Re Virginia, 25 L. Ed. 676, the Supreme Court of the United States held:

"Whoever by virtue of his public position under a state government deprives another of property, life or liberty without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the state and is clothed with the state's power, his act is that of the state."

Pursuant to the adoption of the Thirteenth and Fourteenth Amendments, and as provided therein in the latter by section 5, Congress, in 1866, enacted section 1 of Act, April 9, c. 31, 14 Stat. 27 (8 U. S. C. A. sec. 42 and note), which reads:

"All citizens of the United States shall have the same right in every state and territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property."

See, also, 16 Stat. 144, sec. 16, adopted by Congress in the year 1870.

As a consequence of federal adoptions and enactments, it appears conclusively that it is the settled federal policy, applicable to such legislative acts in the states as the one now under consideration, that the Negro's rights, in relation to property, will be extended to an equal and exact enjoyment of such rights as are possessed by white citizens. Since this is so, segregation ordinances based on color cannot endure. For inasmuch as the Negro enjoys the unabridgable right to "inherit, purchase, lease, sell, hold and convey" real estate and enjoy the use as an incident of those rights exactly and to the same extent as does the white or other citizen, and since the white citizen may acquire and use property for residential purposes in blocks a majority of which are white residents, it is evident that the segregation ordinance therein fails of its purpose.

It is shown by the record in kindred cases, this day decided, that the city council of Oklahoma City had before it the decision of the Supreme Court of the United States in the Warley Case when it enacted the present ordinance. The city authorities well knew, or should have known, that its act was futile, and in disregard of the decision of the highest and final authority in the United States upon the subject.

It is observed from the findings of the referee, based on evidence adduced by the respondent city in contemporaneous hearings in causes Nos. 26596 and 26597, that the initial step in segregation of the races in this locality occurred in May, 1933, when Honorable William H. Murray, as Governor, issued an executive military order declaring a state of martial law to exist in certain

areas of the city of Oklahoma City, declaring a "segregation zone" for white people and another for black or colored people, and between the two a "nontrespass zone," that the object thereby sought was preservation of the peace and prevention of riot and bloodshed; that the incident giving rise to military order was "that a large number of Negroes were moving, or attempting to move into districts entirely used and occupied by white people," and that such indicated that riot and bloodshed was imminent. That the duration recited by the terms of the decree was, until said city, pursuant to request of the Governor, should pass a valid ordinance in lieu of said order.

Can it be logically argued in any judicial forum of the United States, state or federal, in view of such expositions upon the nature of our government as that contained in the cause of Ex parte Milligan, 4 Wall. 2, 120, holding that "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times and under all circumstances," that a military order possesses more efficacy than the Constitution of the United States and the laws adopted or expressly authorized by that instrument? Can it be, in view of the ordinance being invalid ab initio, that the military order endures as by its terms to supplant the inhibited and abortive legislation? To the contrary in purpose to that of the Emancipation Proclamation of President Lincoln, and unlike it being validated by subsequent law, the military order of Governor Murray is void and unenforceable by due process of law.

Since, therefore, the military order of the Governor was void and legally unenforceable, and notwithstanding that by the terms therein employed the city was directed and enjoined to enact the ordinance presented, the martial law decree afforded no justification whatever for the enactment of the ordinance, nor did this instrument impart any validity to the ordinance.

The city of Oklahoma City was not, as stated in its brief, faced with the "dilemma of allowing martial law to remain in force and effect or * * * adopting such a comprehensive zoning law as to cope with the problem."

It is likewise urged, in view of such a fancied situation, that "no court would say that the police power could not be extended fairly by a legislative group, when the extension of that power was the only substitute that it had to supplant a government by martial law."

The substance of this contention is advocacy of the policy of committing a known wrong to alleviate a wrongful burden—meeting force with force, exercising wrongfully police power to defeat illegal martial law, which is but the power of police unlawfully employed.

The judgment is reversed and the cause is remanded, with directions to issue final injunctive process as sought in the petition of plaintiff.

McNEILL, C. J., OSBORN, V. C. J., and BAYLESS, BUSBY, WELCH, CORN, and GIBSON, JJ., concur. PHELPS, J., not participating.