**UNITED STATES v. PHILLIPS, Governor
of Oklahoma, et al.**

No. 351.

District Court, N. D. Oklahoma.

April 25, 1940.

Whit Y. Mauzy, U. S. Dist. Atty., and Chester A. Brewer, Asst. U. S. Dist. Atty., both of Tulsa, Okl., Frederick Bernays Wiener, of Providence, R. I., Maxwell G. Elliott, Jr., of Washington, D. C., Peter J. Chamales, of Vinita, Okl., and Willard W. Gatchell, of Washington, D. C., for the Government.

Ramsey, Martin & Logan, of Tulsa, Okl., J. B. Dudley and Duke Duvall, both of Oklahoma City, Okl., for defendants Leon C. Phillips and others.

Mac Q. Williamson, Atty. Gen., of Oklahoma, Randall Cobb, First Asst. Atty. Gen., of Oklahoma, and Fred Hansen, Asst. Atty. Gen., of Oklahoma, for state officials, and for Mac Q. Williamson.

R. L. Davidson, Gen. Counsel, of Vinita, Okl., for Grand River Dam Authority and others.

Richard L. Wheatley, of Vinita, Okl., and Roy W. Crimm and James E. Burke, both of Kansas City, for defendant Massman Const. Co.

E. C. Fitzgerald, of Miami, Okl., for defendant First Nat. Bank of Miami, Okl., trustee.

Before WILLIAMS, Circuit Judge, and KENNAMER and MURRAH, District Judges.

PER CURIAM.

### Findings of Fact.

1. The defendant Leon C. Phillips is the duly qualified and acting Governor of the State of Oklahoma, and Commander-in-Chief of its National Guard and Militia.

2. The defendant Mac Q. Williamson, is the duly qualified and acting Attorney General of the State of Oklahoma.

3. The defendant Louis A. Ledbetter, is the duly qualified and acting Adjutant General of the National Guard of the State of Oklahoma.

4. The defendants S. H. Singleton, George Meacham, and H. E. Bailey, are the duly qualified and acting members of the State Highway Commission, an agency of the State of Oklahoma, created and functioning by virtue of Article 2, of Chapter 50, of the Session Laws of 1939, of the State of Oklahoma, 69 Okl.St.Ann. § 27.1 et seq.

5. The plaintiff has dismissed the complaint as against the defendant, State Highway Commission, but not against the members of the Commission as individual defendants.

6. The defendant Grand River Dam Authority is a conservation and reclamation district constituting a governmental agency of the State of Oklahoma and a body corporate and politic created and existing by virtue of Article 4 of Chapter 70 of the Session Laws of 1935 of the State of Oklahoma, as amended, 82 Okl.St.Ann. § 861 et seq., and having its domicile and principal place of business at Vinita, Oklahoma.

7. The defendants, Ray McNaughton, H. Eichenberger, Earl Ward, R. P. Colley, and M. Duncan, are the members of the Board of Directors of the Grand River Dam Authority. The defendant, T. P. Clonts' is the General Manager of the Grand River Dam Authority and the defendant W. R. Holway is the Chief Engineer of said Authority.

8. The defendant Massman Construction Company, Inc., a corporation, duly organized and existing under the laws of the State of Missouri, is the general contractor with said Authority for the construction of the dam hereinafter referred to, and is doing business in the State of Oklahoma.

9. The defendant First National Bank of Miami, is a national banking association duly organized and existing under the laws of the United States, having its principal place of business at Miami, Oklahoma, and

is trustee under a certain indenture of trust, dated as of April 1, 1938, entered into by and between said bank and said Authority and pursuant to which there have been issued and by which there have been secured the bonds of said Authority hereinafter referred to and now held by the United States. Said indenture of trust, Government Exhibit 6, is incorporated in these findings by reference.

10. During the early fall of 1937, the United States, by its Federal Emergency Administrator of Public Works, acting with the approval of the President, and pursuant to the provisions of Title II of the Act of Congress of June 16, 1933, and all acts amendatory thereof and supplementary thereto, 40 U.S.C.A. § 401 et seq., made an allotment to the defendant Grand River Dam Authority to aid in financing the construction of a dam on the Grand River in the State of Oklahoma, together with hydro-electric generating plant and transmission lines, including necessary equipment and the acquisition of the necessary land and rights of way therefor.

11. The purpose of said dam was to provide water storage for flood control and hydro-electric power development. Said allotment was for a loan in an amount of $11,563,000 and for a grant in the amount of forty-five per cent of the cost of the project, but not to exceed $8,437,000.

12. On October 16, 1937, the United States by its Federal Emergency Administrator of Public Works, made a formal written offer to the defendant Grand River Dam Authority pursuant to said allotment and said offer was accepted in writing by the Authority on that date.

13. The acceptance of said offer (as modified by subsequent waivers) contained a covenant obligating the Authority to complete the project, including the dam to a height of 755 feet, not later than March 30, 1940. Said offer, as modified by all subsequent waivers, Government Exhibit 2, and said acceptance, Government Exhibit 3, are incorporated in these findings by reference.

14. Pursuant to its obligation under said offer and acceptance, the United States has purchased and is now the owner and holder of $11,563,000 aggregate principal amount of the bonds of the defendant Grand River Dam Authority issued pursuant to and secured by said indenture dated as of April 1, 1938, being all such bonds outstanding.

15. The United States is now the holder of all outstanding bonds and coupons issued by the defendant Grand River Dam Authority pursuant to and secured by said indenture.

16. All of said bonds were approved, Government Exhibit 4, incorporated herein by reference, as to legality and validity by the defendants Williamson as Attorney-General of the State of Oklahoma and ex-officio Bond Commissioner of the State of Oklahoma.

17. Such bonds are secured by a first and prior, effecting pledge of, being payable solely from the revenues of the Authority, and as a prior and preferred lien thereon from whatever source derived, including all revenues received from the flood control and hydro-electric project after payment of reasonable and proper expenses of maintenance and operation. The sole and prior and exclusive security for said bonds is the revenue to be derived as aforesaid from said project, and in the event of a default under the indenture securing said bonds the United States may cause to be appointed a receiver to take possession of and operate said project for the benefit of holders of such bonds all as in said indenture provided.

18. The United States has also paid over $5,562,500 of the grant. The remainder of the grant is normally payable upon completion of the project.

19. Since the date of said allotment, neither the State of Oklahoma nor any of its agencies, instrumentalities or subdivisions has contributed any funds whatever towards the cost of said project. Prior to the date of the allotment, the Oklahoma Planning and Resources Board paid about $5,000 for preliminary expenses.

20. The defendant Grand River Dam Authority commenced construction of the said flood control and hydro-electric project on or about February 7, 1938, and has now virtually completed the construction of the main dam. As of February 20, 1940, the total amount actually disbursed by said Authority for all purposes in connection with such construction was approximately $14,984,000, and was paid for solely out of funds furnished by the United States by way of the loan and grant above referred to.

21. Prior to construction of said dam, the defendant Grand River Dam Authority secured a license from the Federal Power Commission, an independent agency of the

United States, to build said dam on the bed of the Grand River, a tributary of a navigable river of the United States, and to impound the waters of said Grand River for the purposes of the project. Said license, Government Exhibit 6, is incorporated in these findings by reference.

22. In order for the defendant Grand River Dam Authority to perform its contractual obligations under the indenture and the loan and grant agreement aforesaid, it must complete said dam and commence the flooding of the reservoir area immediately, before the expected onset of the spring floods in April, 1940.

23. The Grand River Dam is a multiple arch dam, almost a mile long, with a gravity portion to be used as a spillway at its eastern end.

24. The major portion of the dam consists of buttresses supporting concrete arches. These arches have a span of 64 feet, with a thickness ranging from 5 feet at the bottom to less than 3 feet at the top. The arches are virtually concrete shells, which carry the weight of the water on to the buttresses, in the same manner as the arches of a bridge carry the load on to the piers of the bridge. The spillway section of the dam is a gravity dam, which stays in place and retains the weight of water behind it with its own weight.

25. The Grand River Dam was not designed to have excess water flow over the top of the arches; all such water was to flow over the gravity spillway.

26. Previous hydrographic experience on the Grand River, Government Exhibit 15, incorporated herein by reference, shows that the floods come in April, May, and June, and that thereafter there is no substantial amount of high water until the same months of the following year.

27. On or about February 10, 1940, the defendant Massman Construction Co. submitted, and the defendant Grand River Dam Authority approved, a closing schedule. This schedule provided plans for closing the six temporary openings, eight by ten feet, which had been left at arches 7 and 8 to carry off the flow of the Grand River during construction.

28. The closing was to be done, if possible, at low water, in January, February, or March of the year, but the exact time of closing was dependent upon the progress of construction on the arches. The schedule provided that the closing should take place when the arches reached elevation 700. It was estimated that at that elevation further construction on the arches could be completed in sufficient time to carry the arches to the top of the dam, viz., elevation 755, before any expected flood could overtop the arches.

29. The closing schedule contemplated that five of the openings would be fully plugged when the arches reached elevation 700, and that the remaining opening would be closed by a steel sluice gate, motor-operated, to permit water to flow down stream for the benefit of the water users below the dam.

30. On or about March 22, 1940, when arch 6 reached elevation 700, Government Exhibit 16, incorporated herein by reference, the five temporary openings were closed with concrete, and the sixth was closed by means of a steel sluice gate.

31. When the lake behind the dam reaches elevation 678, the sluice gate opening will be permanently plugged with concrete. Thereafter water for the down stream users will be supplied through the permanent outlet at elevation 675, and through the turbines.

32. If the six openings in the dam had not been closed at the time they were, and high water had come down the river, a large volume of muddy water would have gone through those openings at very high velocity, which would have scoured out the rock adjacent to the buttress walls. If this volume of water had continued to flow for any length of time, there would have been a strong possibility of serious undermining of the foundations, and a probability that the buttresses themselves might topple over and fall, carrying the arches with them.

33. If the dam were not completed, and high water were to come with the openings closed and some of the arches at elevation 700 and no higher, this being the condition of the dam at the time of the hearing on the application for temporary injunction, the following is the damage to be anticipated: The water would fall from elevation 700 down to the rock foundation at elevation 615, and would cause serious damage to the foundations, tearing the rock out between the adjacent buttresses. The rock had been paved with a thin layer of concrete and had not been designed to carry water that fell over the arches. The rock thus broken up would undermine the buttresses, and, in all probability, the buttresses themselves. The buttresses would

also be undermined by the water pouring down right next to the buttress. The estimated result would be that a large section of the dam would be likely to go out.

34. Under anticipated high water conditions, based on the hydrographic experience on the river, it would not be possible to take preventive measures in sufficient time to prevent the estimated damage which would be caused by the floods in the event that the openings had not been closed or in the event that the dam were not completed.

35. The estimated damage which would be caused by a failure to complete the dam, in addition to the physical damage to the structure, would be as follows: The United States would hold a portfolio of greatly depreciated, if not worthless, bonds. The defendant Authority would be left with only a ruin after large expenditures. The defendant Massman Construction Co. would suffer a severe financial loss, in all probability be unable to bid on other projects because of exhausting its bonding capacity. Over a thousand men would be thrown out of work. Incalculable flood damage and loss of life would occur down stream.

36. A failure to close the dam at this time would result in the loss of a year's power revenues, estimated at $1,000,000. If the power pool were permitted to be formed, but kept at elevation 730, the level of the spillway, the annual loss of revenues would be $600,000.

37. The testimony of the Government's engineering witnesses was not contradicted in any way, and the defendants produced no witnesses on any of the engineering issues.

38. Unless said dam can promptly be completed and the reservoir area flooded, it will be impossible to impound sufficient waters for the power operations of the Authority for the coming year, with the result that there will be no revenues available for the payment of principal of, or interest on, said bonds.

39. While the dam was under construction a controversy arose between the defendant Grand River Dam Authority on the one hand, and the defendants Phillips, Singleton, Meacham, and Bailey on the other, as to the obligation of the defendant Grand River Dam Authority to reimburse the State Highway Commission for the State roads to be flooded as a result of the construction of the project.

40. The defendant Grand River Dam Authority claims that during or about the month of March, 1938, it agreed with the State Highway Commission that if the said Authority would construct a highway bridge located in Delaware County, Oklahoma, in Township 25 North, Range 23 East, approximately three and one-half miles northwest of the town of Grove, the State Highway Commission would accept this in full payment of the said Authority's obligation to pay for flooded roads. Thereafter said bridge was built and completed pursuant to said agreement by said Authority at a cost of $369,083.

41. Thereafter, the defendant Phillips maintained that there was no such agreement or that, if any agreement had been consummated, it was invalid.

42. The defendant Phillips thereafter threatened to prevent completion of said dam and the flooding of the reservoir area unless said Authority, or the United States of America, would make provision for compensating the State Highway Commission for flooded roads above and beyond the provisions for the source and time of payment of such compensation set out in the Oklahoma Statute creating the Authority.

43. The said threats of the defendant Phillips were part of a plan on his part to exact for the State of Oklahoma from the United States, money in payment of flooded roads over and above the statutory provisions, which payment the United States would be induced to make in order to prevent the frustration of the purpose of the grant from the United States, and the impairment or destruction of the security for the bonds owned by the United States.

44. Failing to obtain such further provisions for compensation on account of flooded roads, from the defendant Grand River Dam Authority, or from the United States, and in furtherance of such plan, the defendant Phillips on March 13, 1940, declared martial law in an area surrounding the dam-site but in said area only, and ordered defendant Ledbetter to occupy said area with the military forces of the State and to maintain the same against all interference with units of the National Guard, and to stop all work on the Grand River Dam. The defendant Phillips' Executive Military Order declaring martial law, Government Exhibit 1, is incorporated in these findings by reference.

45. More than twelve hours prior to the promulgation of said Executive Order de-

claring martial law, the defendant Ledbetter anticipated said order, and alerted (Government Exhibit 12–b, incorporated herein by reference), Major H. B. Parris and Company M, 180th Infantry, Oklahoma National Guard.

46. Major Parris and two other officers, in uniform, arrived at the dam-site on the evening of March 13, after the declaration of martial law, and ordered Towne, Massman Construction Co.'s superintendent, not to divert the flow of the river further or to close the openings or to make any further pours on Arch 6, until further orders. No further orders were given by them.

47. In the morning of March 14, the personnel of said Company M, 180th Infantry, Oklahoma National Guard, in uniform, arrived at the Dam-site in trucks. Company M is a machine-gun company, and was fully armed with rifles, machine guns and pistols, all of which had been supplied to it by the United States. The men did not get out of their trucks, and were sent back to their armory about an hour later.

48. In the morning of March 14, the defendant Ledbetter and some of his staff also arrived. All were in uniform. After Company M returned home, Major Parris and two other officers remained at the dam-site in uniform, as military observers, until March 21. On that day they were relieved.

49. Their places were taken by two other officers of the Oklahoma National Guard, who were at the dam-site, in uniform, as military observers, until the hearing in this cause on the application for temporary injunction, there appearing in uniform as witnesses. They had not been relieved at the time of this hearing from their said station as observers. Government Exhibit 11–d; incorporated herein by reference.

50. The presence of the armed military personnel above referred to constituted a use of armed violence and military force, and prevented the said Authority, the Massman Construction Co., and their officers and agents, from closing said dam until after the restraining order issued by the federal court relieved the situation.

51. The orders issued by the military personnel above referred to hindered the work of the defendant Massman Construction Co., and by the time of the hearing on the application for a temporary injunction in this cause, would (but for the restraining order heretofore issued herein) have seriously interfered with the work of completing the dam.

52. At no time before or after said proclamation of martial law or during the pendency of martial law as thus declared by defendant Phillips was there any insurrection, rioting, tumult or violence made to or displayed in any way against civil authority or any failure in the functioning of civil authority, in and about the said dam-site and reservoir area, or in the counties in which the dam is located.

53. At no time before or after said proclamation of martial law, or during the pendency of martial law as thus declared by the defendant Phillips, were the processes of law interfered with, or lawless acts committed other than the actions of the defendants Phillips and Ledbetter and their military subordinates, which interfered with the completion of said dam by the defendant Grand River Dam Authority.

54. At no time before or after said proclamation of martial law, or during the pendency of martial law as thus declared by the defendant Phillips, were the local law enforcement authorities having jurisdiction in the vicinity of the dam-site and project area, unable to perform their duties, nor were the civil courts closed or their processes interfered with in any way.

55. The defendant Phillips has not revoked his declaration of martial law, nor has he publicly modified it in any way.

56. The defendants Phillips and Ledbetter have at no time disclaimed either their right or their intention to re-order the troops back to the dam-site, and their maintenance of military personnel at the dam-site constitutes a threat to order additional military forces to the dam-site and reservoir area.

57. On March 14, 1940, the defendants Phillips, Williamson, Singleton, Meacham, and Bailey, in further pursuance of the plan above referred to, caused to be filed in the District Court of Ottawa County, Oklahoma, a suit numbered 15174, and entitled "State of Oklahoma ex rel. Leon C. Phillips, Governor, and State Highway Commission v. Grand River Dam Authority, Ray McNaughton, H. Eichenberger, Earl Ward, R. P. Colley, and M. Duncan as members of the Board of Directors of the Grand River Dam Authority; T. P. Clonts, General Manager of the Grand River Dam Authority; W. R. Holway, Chief Engineer of the Grand River Dam Authority; and Massman Construction Company, Inc., a

corporation". Said suit sought, inter alia, an injunction against the completion of the dam and against its closing, but sought no damages, either as original or as alternative relief. The petition in said suit, Government Exhibit 13, is incorporated in these findings by reference.

58. A temporary restraining order was issued ex parte in said suit returnable Wednesday, March 20, 1940, at 9 A. M. Said restraining order, Government Exhibit —, is incorporated in these findings by reference. Neither the United States nor any agency, or officer thereof, was made or attempted to be made a party to said suit, nor could the United States have been sued or made a party thereto in said state court.

59. Said restraining order expired of its own terms on March 20, 1940, subsequent to the entry of the temporary restraining order and order to show cause in the present case. No further proceedings have been taken in said state suit since the date of the temporary restraining order and order to show cause entered herein, save that the United States by Whit Y. Mauzy, its attorney for the Northern District of Oklahoma, filed therein on Wednesday morning, March 20, 1940, a suggestion of lack of jurisdiction by reason of the absence of the United States, an indispensable party, and for other reasons therein set forth, including the reason that said suit was in effect against the United States and its property. Said suggestion, Government Exhibit 13a, is incorporated in these findings by reference.

60. The directors of the defendant Grand River Dam Authority, under date of March 14, called upon the defendant Massman Construction Co. to comply with its contract, and to take all necessary steps to that end. Thereafter, the directors of the defendant Grand River Dam Authority instructed its counsel not to remove the said Ottawa County suit to the federal court.

61. None of the defendants, Phillips, Williamson, Singleton, Meacham, and Bailey, took any steps to enjoin, restrain, or otherwise prevent the defendant Grand River Dam Authority from receiving an allotment from the United States as aforesaid, accepting the offer from the United States as aforesaid, from issuing its bonds, or from constructing said dam. On the contrary, all these defendants acquiesced in all such actions until March 13, 1940, when the defendant Phillips declared mar-

tial law. Government Exhibits 4, 18, 19 and 21, all incorporated herein by reference.

62. Since at least November, 1939, all of the defendants, Phillips, Williamson, Singleton, Meacham, and Bailey, have had knowledge of the intention of the Grand River Dam Authority to inundate the State roads within the reservoir area without further prepayment of damages therefor. Government Exhibits 4, 18, 19 and 21 incorporated herein by reference.

63. None of the defendants hereto, either severally or in the aggregate, are financially able to respond in damages to the United States to the extent of $11,563,000.

64. The acts of the defendants hereto, threaten the property interests of the United States.

65. The marketability of the bonds and coupons issued by the defendant Authority which are now held by the United States will be seriously impaired if there should be any damage to the dam, or any delay in the closing of the dam or in the formation of the power pool, or further interference with the project.

66. There was no necessity at the damsite or the reservoir area for or justifying the use of military force.

67. There was no emergency at the damsite, or the reservoir area, authorizing or justifying the use of military force.

68. Prior to the incurring of any indebtedness, liability, or obligation of the Authority to the State of Oklahoma, or any sub-division thereof, for any injury occasioned, or expenses incurred, by reason of the overflowing and inundation of any public roads or highways or public property or the requiring of the relocation of roads and highways, the Authority by appropriate resolutions and by the terms of said indenture conferred a prior lien in favor of the United States on all of the revenues received by the Authority in respect of its properties as security for the payment of said bonds owned by the United States.

69. The restraining order granted in the District Court of Ottawa County and the injunction prayed for therein, if allowed, would in fact result in forestalling and preventing the completion of the project and the closing of the dam. They would further in fact forestall and prevent the construction of the dam to a height in excess of 700 feet. If the restraining order had

been carried out or an injunction as prayed had been granted and carried out, the consequence in fact would be that the source of payment of the obligations due the United States and the security for the bonds of the United States would be seriously impaired or destroyed. The rights and property interests of the United States under (a) the Acts of the Legislature of the State of Oklahoma, (b) the bonds, (c) the trust indenture, (d) the loan agreement, (e) the license from the Federal Power Commission, would in fact be impaired or destroyed by any relief that could be granted on the petition in the District Court of Ottawa County, and particularly by the relief prayed and by the restraining order already granted.

70. There is imminent and immediate danger of damage to and destruction of the property interests of the United States in the project and in the bonds.

71. The defendants have been and are endangering these property interests.

72. The United States' property interests require protection of injunction to restrain the threatened illegal acts of the defendants.

Findings requested by defendants except as herein covered are denied.

### Conclusions of Law.

1. The defendant Grand River Dam Authority is obligated to continue the construction of the dam with all practicable dispatch and failure to do so constitutes a default. Government Exhibit 5, Indenture, Sec. 4.08, and Sec. 10.01(f), and Exhibit 2, Sec. 2(e), incorporated herein by reference.

2. The United States as the holder of all the bonds and coupons outstanding is empowered by the law of Oklahoma, in the event of default, to protect its rights, and "by action or suit in equity, enjoin any acts or things which may be unlawful or in violation of the rights of the holders of such bonds." Okla.Sess.Laws of 1935, Ch. 70, Art. 4, Sec. 10, as amended by Okla. Sess.Laws of 1939, Ch. 70, Art. 2, Sec. 1 and Sec. 9 of 1935 Act, as amended, 82 Okl. St.Ann. §§ 870, 869.

3. The United States as holder of all the bonds and coupons issued by the Grand River Dam Authority has a first and prior lien upon the revenues of the Grand River Dam project, subject only to reasonable and appropriate expenses of the maintenance and operation of said project.

4. The United States as holder of all the bonds and coupons issued by the Grand River Dam Authority has a property interest in the dam and project, and is entitled to protect that interest from damage by the unlawful acts of the defendants.

5. The United States is entitled to protect its property interest against interference by defendants who are financially unable to respond in damages to the full extent of the possible injury to the interest of the United States. Marshall v. Homier, 13 Okl. 264, 269, 74 P. 368; Pomeroy, Equity Jurisprudence (4th ed. 1919) Sec. 1911.

6. The United States has a right to the specific performance of the covenants contained in the license of the Federal Power Commission, in the loan and grant agreement, and in the indenture, requiring construction of the dam to an elevation of 755 feet. United States v. Union Pacific Ry. Co., 160 U.S. 1, 16 S.Ct. 190, 40 L.Ed. 319.

7. This right to specific performance is a property interest, which the United States is entitled to protect against interference by third persons.

8. The sending of uniformed troops to the dam-site under color of the Governor's proclamation of martial law constitutes the use of military force.

9. The Governor of Oklahoma was not justified or authorized in employing military force to stop construction of the dam.

10. Property interests will be protected by injunction against improper taking thereof by military force under color of a declaration of martial law. Sterling v. Constantin, 287 U.S. 378, 393, 394, 53 S.Ct. 190, 77 L.Ed. 375; Russell Pet. Corp. v. Walker, 162 Okl. 216, 19 P.2d 582; Allen v. Oklahoma City, 175 Okl. 421, 52 P. 2d 1054; Fluke v. Canton, 31 Okl. 718, 123 P. 1049; Strutwear Knitting Co. v. Olson (three-Judge case), D. C., 13 F.Supp. 384.

11. Where there is no actual or apparent violence threatening public safety, the use of military force which interferes with property rights will be enjoined.

12. A Governor's proclamation of martial law does not legalize his use of military force where, in fact, as in this case, there is no violence or disorder or resistance to civil authority.

13. The Governor's action in using military force in this case is subject to judicial review.

14. A state Governor using military force in contravention of the limitations of the Federal Constitution may be enjoined by a federal court.

15. Such a Governor is still subject to injunction, if he retains military personnel on the grounds in uniform and on active duty under such declaration. Strutwear Knitting Co. v. Olson, three judge case, D. C., 13 F.Supp. 384, and cases therein cited.

16. The Governor's use of military force in the present situation was illegal and in violation of the due process clause of the Fourteenth Amendment.

17. The directors of the defendant Grand River Dam Authority are appointed by the Governor and are removable by him for "inefficiency, neglect of duty, or misconduct in office" upon mere ten days' written notice by the Governor to such directors without any hearing. Okla.Session Laws of 1935, Ch. 70, Art. 4, Sec. 3, as amended by Okla.Sess.Laws of 1939, Ch. 70, Art. 1, Sec. 1, 82 Okl.St.Ann. § 863.

18. The defendants Singleton, Meacham, and Bailey are appointed by the Governor, by and with the consent of the Oklahoma Senate, but are removable by the Governor alone. Okla.Sess.Laws of 1939, Ch. 50, Art. 1, Sec. 2, 82 Okl.St.Ann. § 863.

19. Its general counsel was instructed by the authority not to remove the suit in the District Court of Ottawa County to the federal court.

20. The said state court suit would have been removable to the federal court if all the defendants thereto had joined in the removal. Grand River Dam Authority v. Going, D.C., 29 F.Supp. 316.

21. The state court suit being one affecting the property interests of the United States, and being subject to removal, it does not follow that the conclusion should be made that there was good faith and no collusion.

22. The state court suit is a suit against the United States to which the United States is an indispensable party.

23. The United States may not be sued without the consent of Congress.

24. Congress has not consented for the United States to be sued by the State of Oklahoma in the state courts of Oklahoma in respect of the subject matter of the Ottawa County suit, and no officer of the United States has power to give to the District Court of Ottawa County, Oklahoma, jurisdiction of said suit against the United States.

25. In the state court suit no injunctive relief can be granted or run against the Governor of Oklahoma. State v. Huston, 27 Okl. 606, 113 P. 190, 34 L.R.A.,N.S., 380.

26. Section 265 of the Judicial Code, 28 U.S.C.A. § 379, does not apply to cases where the United States is protecting its property interests.

27. Section 265 of the Judicial Code does not apply to the present situation where the remedy available in the state court is inadequate.

28. The United States cannot be forced to intervene in the state court suit to protect its property interests.

29. Section 265 of the Judicial Code does not bar this court from enjoining further proceedings in the state court suit. United States v. Inaba, D.C., 291 F. 416; United States v. McIntosh, D.C., 57 F.2d 573; United States v. Babcock, D.C., 6 F.2d 160; Babcock v. United States, 7 Cir., 9 F.2d 906.

30. The present suit is not a suit against the State but only against State officers acting illegally. Sterling v. Constantin, 287 U.S. 378, 393, 394, 53 S.Ct. 190, 77 L.Ed. 375.

31. The claim of the state highway commission for damages against the defendant Grand River Dam Authority in respect to flooding of State roads does not appear to raise any constitutional question. None of the lands held by the Commissioners of the Land Office in said area may be classed as public lands. Trenton v. New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L. Ed. 937, 29 A.L.R. 1471; Hunter v. Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151; Section 7, Enabling Act, June 16, 1906, 34 Stat. 272; Betts v. Com'rs Land Office, 27 Okl. 64, 110 P. 766.

32. The Oklahoma statute does not require prepayment of damages as a condition precedent to overflowing or inundating the roads or highways. Okla.Sess.Laws 1935, Ch. 70, Art. 4, Sec. 2(h), 82 Okl.St. Ann. § 862(h).

33. The Governor appears to contend that the provisions of the Oklahoma Statute creating the Grand River Dam Authority, a State agency, do not adequately safeguard

the rights of the State Highway Commission, another State agency. Though well founded, the use of military force to interfere with the closing or completion of the dam would not be justified. Nor would the Governor and the Highway Commissioners, defendants Meacham, Singleton and Bailey, be justified in procuring the ex parte restraining order from the state court jeopardizing the property interests of the United States, and in which action the United States can not intervene.

34. The present case was cognizable before a District Court of three judges. Judicial Code, Sec. 266, 28 U.S.C.A. § 380; Sterling v. Constantin, 287 U.S. 378, 393, 394, 53 S.Ct. 190, 77 L.Ed. 375; Strutwear Knitting Co. v. Olson, (a three judge case), D.C., 13 F.Supp. 384.

35. By reason of Section 9 of the Oklahoma Session Laws of 1935, Ch. 70, Art. 4, 82 Okl.St.Ann. § 869, and further, the conferring of a prior lien on all of the revenues received by the Authority in respect of its properties as security for payment of the bonds owned by the United States, the right, if any, of the State of Oklahoma, or its subdivisions, to payment of any damages by the Authority by reason of overflowing, or inundation of any public roads or such public property or the requiring of the relocation of roads and highways is wholly junior and subordinate to the interest of the United States as the holder and owner of such bonds.

36. The property rights of the United States in the project, its contract for prior lien on and prior lien to the revenues therefrom and the property interest and funds owned or controlled by the Authority, are prior or superior and senior to any rights or claim of interest on the part of the State of Oklahoma in or to the project, and any revenues from said project or any property or funds owned or controlled by the Authority are prior, superior, and senior to any claim of the State of Oklahoma or any subdivision thereof because of any alleged indebtedness, liability or obligation of the Authority. Any indebtedness, liability or obligation of the Authority to the State of Oklahoma or any subdivision thereof may be enforced, satisfied or collected only in strict subordination to the foregoing property interest of the United States.

37. The United States is entitled to an injunction restraining further interference with the closing or completion of the dam in order to protect its property rights.

38. A preliminary injunction should issue and let same be submitted accordingly in proper form.