Nelson, J.
The petition and return to the writ of habeas corpus issued in this case, present the following facts:
The prisoner, who is a citizen, and by occupation a farmer, in the Lexington district of the State of South Carolina, some eighty years of age, and never engaged in the military service or connected with the army of the United States, or of the so-called Confederate States, has been arrested and tried before a military commission, in pursuance of orders issued at headquarters of the district of 'Western South Carolina, Columbia, upon a charge of murder, convicted and sentenced for life to the Albany Penitentiary.
The specification in the record of the crime is the killing' of a negro boy, by shooting him on or about the 24th of September, 1865. The trial took place on the 20th of November, and the sentence was pronounced on the first of December following. The sentence is approved by the order of Brevet Major General A. Ames, and also of *671 Major General D. E. Sickles. The only paper or evidence before us, on the return to the writ of habeas corpus, is the record or order of committal in the hands of General Pilsbury, the superintendent of the penitentiary, which contains the above facts.
It will be observed that this trial before the military commission, took place some seven months after the termination of hostilities, and the surrender of the rebel army to the authorities of the United States; and, further, that the offense is one which, according to our constitutional system of Government, is cognizable by the judicial authorities of the State, and not of the Federal government. And, also, that the trial was not under the rules and articles of war, as established by the United States, in Congress assembled, as these are limited to the government of the land or naval forces of the United States, and of the militia when in actual service in time of war or public danger.
The trial must have been had under what is known and denominated “martial law,” and the question in the case is, whether or not this conviction and punishment can be upheld by reason of that authority.
All respectable writers and publicists agree in the definition of martial law—that it is neither more nor less than the will of the general who commands the army. It overrides and suppresses all existing' civil laws, civil officers and civil authorities, by the arbitrary exercise of military power; and every citizen or subject—in other words, the entire population of the country, within the confines of its power—is subjected to the mere will or caprice of the commander. He holds the lives, liberty . and property of all in the palm of his hand.
Martial law is regulated by no known or established system or code of laws, as it is over and above all of them.
The commander is the legislator, judge and executioner. *672 His order to the provost marshal is the beginning and the end of the trial and condemnation of the accused.
There may be a hearing, or not, at his will. If permitted, it may be before a drum-head court martial, or the more formal board of a military commission, or both forms may be dispensed with, and the trial and condemnation equally legal, though not equally humane and judicious.
The law officers of the Crown, in England, in giving their opinion in the matter of the insurrection in the Island of Jamaica, observe, that courts martial as they are called, by which martial law is administered, are not, properly speaking, courts martial or courts at all. They are mere committees formed for the purpose of carrying into execution the discretionary power assumed by the government; on the one hand they are not obliged to proceed in the manner pointed out by the mutiny act and articles of war; and, on the other, if they do so proceed, they are not protected by them as members of a real court martial might be, except in so far as such proceedings are evidence of good faith.
Lord Wellington, in one of his dispatches from Portugal, (1810) speaking of martial law, observed that, as applied to persons, excepting' officers and soldiers and followers of the army, for whose government there are particular provisions of law in all well regulated countries, it is neither more nor less than the will of the general of the army. He punishes either with or without trial, for crimes either declared to be so, or not so declared by any existing law, or by his own orders. Subsequently, in a speech in the ■ House of Lords, he expressed the same opinion, and added: “ In fact, martial law means no law at all; therefore, the general who declares martial law, and commands that it shall be carried into execution, is bound to lay down distinctly the rules and regulations, according to which his will is to be carried out.”
*673 This being the nature and extraordinary character of martial law, which, as observed by Sir Matthew Hale, is not law, but something indulged rather than allowed as law, all the authorities agree that it can be even indulged only iii case of necessity; and when the necessity ceases, martial law ceases. When a government or country is disorganized by war, and the courts of justice broken up and dispersed, or are disabled, from the prevalence of disorder and anarchy, to exercise their functions, there is an end of all law, and the military power becomes a necessity which is exercised under the form, and according to the practice and usage of martial law. As stated by a distinguished civilian, “ when foreign invasion or civil war renders it impossible for courts of law to sit, or to enforce the execution of their judgments, it becomes necessary to find some rude substitute for them, and to employ for that purpose the military, which is the only remaining force in the community; and while the laws are silenced by the noise of arms, the rulers of the armed force must punish as equitably as they can those crimes which threaten their own safety and that of society, but no longer.”
This necessity must be shown affirmatively by the party assuming to exercise this extraordinary and irregular power over the lives, liberty and property of the citizens, whenever called in question. As explained by the Judge Advocate General of England, before a committee of the House of Commons, in case of martial law declared in Ceylon (and which explanation has been approved by the law officers of the Crown), in answer to a question put by Sir Eobert Peel, he observed, “I believe the law of England is, that a Governor, like the Crown, has vested in him the right, where the neóessity arises of judging of it, and being responsible for his work afterwards, so to deal with the laws as to supersede them all, and to proclaim martial law for the safety of the colony.” And, again, in answer to a question by Mr. Gladstone: “I say he is responsible *674 just as I am responsible for shooting a man on the king’s highway, who comes to rob me. If .1 mistake my man, and have not, in the opinion of the judge and jury who try me, an answer to give, I am responsible.”.
Applying these principles to the case in hand, we think the record fails to show any power on the part of the military officer over the alleged crime therein stated, or jurisdiction of the military commission appointed by him to try the accused. No necessity for the exercise of this anomalous power is shown; For aught that appears, the civil, local courts of the State of South Carolina, were in the full exercise of their judicial functions, at the time of ' this trial, as restored by the suppression of the rebellion some seven months previously, and by the revival of the laws and re-organization of the State government in obedience to, and in conformity with its constitutional duties to the Federal Union.
Indeed, long previous to this a provisional governor had been appointed by the President, who is Commander-in-Chief of the Army and Navy of the United States, (and whose will, under martial law, constituted the only rule of action) for the special purpose of changing the existing state of things and restoring civil government over the people. In pursuance of this appointment, a new constitution had been formed, a governor and legislature elected under it; and, the State in the full enjoyment, or entitled to the full enjoyment, of her constitutional rights and privileges.
The Constitution and laws of the Union were thereby acknowledged and obeyed, and were as authoritative and binding over the people of the State, as in any other portion of the country. Indeed, the moment the rebellion was suppressed, and the government growing mut subverted, the ancient possession, authority and laws resumed. their accustomed sway, subject only to the new re-organization or the appointment of the proper officers to give to them operation and effect.
*675 This re-organization and appointment of the public functionaries which was under the superintendence and direction of the President, as Commander-in-Chief of the Army and Navy of the country, who, as such, had previously governed the people of the State from imperative necessity by force of martial law, had already taken place, and the necessity no longer existed.
We have not deemed it necessary, if proper, to look into ■ the merits of the offense charged against the prisoner, although it is insisted that it occurred in self-defense, and in resisting a violent assault upon himself.
Let the prisoner be discharged.