## UNITED STATES v. MINORU YASUI.
### No. 16056.

District Court, D. Oregon.
Nov. 16, 1942.

Carl C. Donaugh, U. S. Atty., and J. Mason Dillard, Asst. U. S. Atty., both of Portland, Or., and Charles S. Burdell, Sp.

Asst. to Atty. Gen., of Seattle, Wash., for plaintiff.

Earl F. Bernard, of Portland, Or., for defendant.

Green & Landye, B. A. Green, James T. Landye, Dey, Hampson & Nelson, R. R. Morris, Jack M. McLaughlin, Hart, Spencer, McCulloch & Rockwood, Omar C. Spencer, Manley B. Strayer, Maguire, Shields, Morrison & Biggs, Randall Kester, and Gus J. Solomon, all of Portland, Oregon, amici curiae.

Earl Warren, Atty. Gen., of California, and Herbert E. Wenig, Deputy Atty. Gen., of California, for the State of California as amicus curiae.

JAMES ALGER FEE, District Judge.

On December 7, 1941, the armed forces of the Emperor of Japan attacked the bases of the United States in the Islands of the Pacific Ocean without warning and without declaration of war. Congress, on December 8, 1941, by joint resolution, declared a state of war to be existing between the Imperial Government of Japan and the Government and people of the United States.[1]

Thereafter, on December 11, 1941, the states of Oregon, Washington, Idaho, Nevada, Utah and Arizona and the Territory of Alaska were designated a theatre of military operations as the Western Defense Command by order of the Secretary of War.

Before the outbreak of hostilities, in August, 1941, Congress had amended a statute[2] passed in 1918 designedly to protect "war material" in time of war by placing under protection by punitive provisions "national-defense material", "national-defense premises" and "national-defense utilities", which are therein broadly defined.[3]

Thereafter, the President of the United States, by Executive Order, Feb. 19, 1942, Number 9066, after reciting that "the successful prosecution of the war requires every possible protection against espionage and against sabotage to national-defense material, national-defense premises, and national-defense utilities as defined" by this statute, authorized and directed the Secretary of War and military commanders designated by him to prescribe military areas in such locations and of such boundaries as might be desired, from which all persons might be excluded and subject to whatever restrictions might be imposed upon the right of persons to enter, remain in or leave, such areas. Lieutenant General John L. DeWitt was designated by the Secretary of War to exercise the authority granted by the Executive Order for the Western Defense Command.

Thereafter, claiming to act pursuant to the Executive Order and the authority vested in him by the Secretary of War, General DeWitt, by Public Proclamation No. 1, on March 2, 1942, declared certain portions of the Western Defense Command, because of its liability to attack or to attempted invasion and because it was subject to espionage and acts of sabotage, a military area "requiring the adoption of military measures necessary to establish safeguards against such enemy operations".

Certain areas were thereby designated as "Military Areas" and "Military Zones". It was thereby announced that "such persons or classes of persons as the situation may require" would, by subsequent proclamation, be excluded from certain of these areas, and further declared that with regard to other of said areas "certain persons or classes of persons" would be permitted to enter or remain therein under certain regulations and restrictions to be subsequently prescribed. Further "Military Areas" and "Military Zones" are designated by the Proclamation No. 2, of March 16, 1942.

Public Act 503, 56 Stat. 173, 18 U.S.C.A. § 97a, passed by Congress and approved by the President March 21, 1942, made it a criminal act for any person to "enter, remain in, leave, or commit any act in any military area or military zone prescribed, under the authority of an Executive order of the President * * * by any military commander designated by the Secretary of War", contrary to the restrictions applicable to any such area if such person knew of the existence, application, and extent, of the restriction.

---

[1] Public Law 328, 55 Stat. 795, 77th Congress, United States Code Cong. Service, No. 9 (1941), p. 843, 50 U.S.C.A. Appendix, note preceding section 1.

[2] Act of April 20, 1918, 40 Stat. 533, 50 U.S.C.A. §§ 101–103.

[3] 50 U.S.C.A. § 104, Act of August 21, 1941, 55 Stat. 655. A previous amendment was Act November 30, 1940, 54 Stat. 1220.

On March 24, 1942, Public Proclamation No. 3 was issued by General DeWitt, reciting "as a matter of military necessity the establishment of certain regulations pertaining to all enemy aliens and all persons of Japanese ancestry within said Military Areas and Zones * * *". This regulation established a curfew law for such enemy aliens and such persons of Japanese ancestry within certain of the zones above indicated.

Minoru Yasui, the defendant, is the son of an alien Japanese father and mother. He was indicted April 22, 1942, on the ground that he had violated the curfew provisions of this proclamation. He pleaded "Not Guilty", waived a jury and was tried by the court. The evidence showed that Yasui was born at Hood River, Oregon, on October 19, 1916. On March 28, 1942, at 11:20 P. M., Yasui walked into the police station in Portland, Oregon, within one of the designated areas. He admits this fact and that he knew it was a violation of the regulation. His contention was and is, however, that he could not be convicted therefor because he was a citizen of the United States and that the regulation is, as to him, unconstitutional and void.

■ It is necessary for the United States in a criminal case, not only to establish the material facts beyond a reasonable doubt, but also to establish that there was an applicable legal basis for the prosecution. This court, established under the Constitution of the United States, must determine jurisdiction at the threshold by pointing to an adequate and valid law, making punishable the acts done by defendant.

Although in the ultimate there is but one question which the court is called upon to decide and that is the guilt or innocence of Yasui, which can be determined by a single unsupported pronouncement of judgment, the argument herein has taken a wide range and such claims have been made that even at the risk of having the utterances called dicta, as is the current fashion regarding those in the Milligan[4] case, the court should reveal the foundation of the findings. Grave danger exists that otherwise the findings might be used as a basis for unwarrantable action in other times.

The fact that the problem of the Japanese citizen and alien, resident in the states bordering the Pacific, has been solved by the army officers in charge, aided by the acquiescence of the vast majority of American citizens of that race, does not relieve the court from the responsibility of determining the case as here presented.

The American officer does not desire to found a military dictatorship but to protect his country from the perils of war. Both by training and choice he is first a citizen and second a soldier. Normally, therefore, he is an adherent even in times of stress to the Constitution and a representative form of government. General DeWitt is an able and resourceful officer. It is certain he has no inclination, even though faced with a serious situation, to violate the fundamental law of the country.

As a premise, then, the existence of a war in which victory is a vital necessity to assure survival of the freedom of the individual guaranteed by the Federal Constitution, must be predicated. The conditions and necessities of preparation for modern war had previously been recognized by this court.[5] The areas and zones outlined in the proclamations became a theatre of operations, subjected in localities to attack and all threatened during this period with a full scale invasion. The danger at the time this prosecution was instituted was imminent and immediate. The difficulty of controlling members of an alien race, many of whom, although citizens, were disloyal with opportunities of sabo-

---

[4] Ex parte Milligan, 4 Wall. 2, 71 U.S. 2, 18 L.Ed. 281.

[5] "In this present period, the wars undeclared under the law of nations, the disregard of international convention, the hostile concentrations cloaked by manifestos of pacific intention, the elimination of time and distance as ponderable factors, the lightning strokes of modern arms are actualities over which the words 'at peace' cannot be permitted to tyrannize in making judgments." Stone v. Oscar Christensen, D.C.Or., December 23, 1940, 36 F.Supp. 739, 743 (Judge Fee). It was there held before declaration of war that the draft act of 1940, 50 U.S.C.A. Appendix, § 301 et seq., was constitutional in order to provide for the national defense.

Ex parte Owens, D.C.Or., Judge McColloch, [No opinion for publication], where it was held that one under eighteen years of age who had enlisted in the National Guard of the State of Oregon without parents' consent could be inducted and compelled to serve after the mobilization in federal service. Affirmed on a different point, Owens v. Huntling, 9 Cir., 115 F.2d 160.

tage and espionage, with invasion imminent, presented a problem requiring for solution ability and devotion of the highest order.

It must be remembered, however, when dealing with the claims made by writers who are not charged with the responsibility of maintaining the structure of the fundamental law and the guarantees of the liberty of the individual, that the perils which now encompass the nation, however imminent and immediate, are not more dreadful than those which surrounded the people who fought the Revolution and at whose demand shortly thereafter, the ten amendments containing the very guarantees now in issue were written into the Federal Constitution [6]; nor those perils which threatened the country in the War of 1812, when its soil was in the hands of the invader and the Capitol itself was violated; nor those perils which engulfed the belligerents in the war between the states, when each was faced with disaffection and disloyalty in the territory in its control. Yet each maintained the liberty of the individual.

In Ex Parte Milligan, supra, a citizen of the United States who had been tried, convicted and sentenced to death by military commission for conspiracy and subversive measures against the federal government, applied for habeas corpus. He had at all times been a resident of the loyal state of Indiana, which was not at the time under occupation by any hostile troops, although it had been previously invaded and was then threatened with invasion.

When this case came before the Supreme Court of the United States, the whole field of the interrelation of the civil and military power was covered in the arguments of able counsel. The court in the opinion of necessity considered thoroughly and intentionally the foundations of military power over civilians. It was necessary there, as here, to determine whether a citizen, who is not a soldier, a prisoner of war, nor a spy in a loyal state not presently invaded, is subject to military jurisdiction, or whether as a non-belligerent he must be tried by civil courts solely for offenses designated by Congress. The direct question in this case was not there involved, because trial by a military commission is not here attempted. But the opinion in all its phases is binding upon this court. It cannot be disregarded. The expressions cannot be brushed aside as dicta, except by a process of wishful rationalization.

The rationale of both the main and concurring opinions is that the civil power in this country is supreme. Neither directly nor indirectly can the military power become dominant. The Constitution, laws and treaties of the United States control. Nor is the situation changed by the incidence of war. This doctrine has been reaffirmed many times by the Supreme Court of the United States,[7] citing the Milligan case.

But it is urged without making a distinction between power based upon military necessity and power based upon Congressional action that in time of war the constitutional guarantees must be re-interpreted. If this be a plea for the exercise of arbitrary power, it is not conceived that it has the support of the military authorities, and, certainly, has not the support of the decided cases. The argument proceeds upon the basis that the disposition of the Supreme Court now is to overlook the constitutional limitations when confronted with an emergency.

It is true that the modern tendency is to refuse to draw tight the circle of inviolability about rights of property [8] under

---

[6] "The first ten amendments were drafted by men who had just been through a war. The Third and Fifth Amendments expressly apply in war." Chafee, Free Speech in the United States (1941) 30.

[7] Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375; Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 426, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481.

"We must therefore first inquire whether any of the acts charged is an offense against the law of war cognizable before a military tribunal, and if so whether the Constitution prohibits the trial. We may assume that there are acts regarded in other countries, or by some writers on international law, as offenses against the law of war which would not be triable by military tribunal here, either because they are not recognized by our courts as violations of the law of war or because they are of that class of offenses constitutionally triable only by a jury. It was upon such grounds that the Court denied the right to proceed by military tribunal in Ex parte Milligan, supra." Ex parte Quirin, October 29, 1942, 63 S.Ct. 2, 11, 87 L.Ed. ——.

[8] United States v. Carolene Products

the due process clause and to change the emphasis in relations of labor and capital.[9] But there is no indication either in peace or war of a disposition to wear away the fundamental guarantees of liberty of the individual. Indeed, the emphasis, if not for extension, by construction at least has been strongly upon increasing vigilance in regard thereto.[10] Here no mere property rights are involved, but the right of personal freedom of action.

The court speaks distinctly in the Milligan case regarding the re-interpretation of the guarantees because of the perils of war.

"It is claimed that martial law covers with its broad mantle the proceedings of this military commission. The proposition is this: that in a time of war the commander of an armed force (if in his opinion the exigencies of the country demand it, and of which he is to judge), has the power, within the lines of his military district, to suspend all civil rights and their remedies, and subject citizens as well as soldiers to the rule of *his will;* and in the exercise of his lawful authority cannot be restrained, except by his superior officer or the President of the United States.

"If this position is sound to the extent claimed, then when war exists, foreign or domestic, and the country is subdivided into military departments for mere convenience, the commander of one of them can, if he chooses, within his limits, on the plea of necessity, with the approval of the Executive, substitute military force for and to the exclusion of the laws, and punish all persons, as he thinks right and proper, without fixed or certain rules.

"The statement of this proposition shows its importance; for, if true, republican government is a failure, and there is an end of liberty regulated by law. Martial law, established on such a basis, destroys every guarantee of the Constitution, and effectually renders the 'military independent of and superior to the civil power'— the attempt to do which by the King of Great Britain was deemed by our fathers such an offence, that they assigned it to the world as one of the causes which impelled them to declare their independence. Civil liberty and this kind of martial law cannot endure together; the antagonism is irreconcilable; and, in the conflict, one or the other must perish." [4 Wall. 124, 71 U.S. 2, 18 L.Ed. 281.]

The question now before this court is whether a military commander has the right to legislate and pass statutes defining crimes which will be enforced by the civil courts. A power to so legislate validly and to execute such laws makes the possessor thereof supreme. The Constitution vests the legislative power in Congress. Article 1, § 1. It is axiomatic that so long as no form of military jurisdiction is in force over the particular locality or person, the civil law will prevail.

The classical definitions of various situations where ordinary civil law does not apply is given in the concurring opinion in Ex parte Milligan, as follows:

"There are under the Constitution three kinds of military jurisdiction: one to be exercised both in peace and war; another to be exercised in time of foreign war without the boundaries of the United States, or in time of rebellion and civil war within states or districts occupied by rebels treated as belligerents; and a third to be exercised in time of invasion or insurrection within the limits of the United States, or during rebellion within the limits of states maintaining adhesion to the National Government, when the public danger requires its exercise. The first of these may be called jurisdiction under Military Law, and is found in acts of Congress prescribing rules and articles of war, or otherwise providing for the government of the national forces; the second may be distinguished as Military

Co., 304 U.S. 144, 58 S.Ct. 778, 82 L. Ed. 1234; Home Building & Loan Association v. Blaisdell, supra, 290 U.S. 448, 54 S.Ct. 231, 78 L.Ed. 413, 88 A. L.R. 1481; Block v. Hirsh, 256 U.S. 135, 145, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165; Hamilton v. Kentucky Distilleries Co., 251 U.S. 146, 156, 157, 40 S.Ct. 106, 64 L.Ed. 194.

9 Lauf v. E. G. Shinner & Co., 303 U. S. 323, 325, 58 S.Ct. 578, 82 L.Ed. 872; National Labor Relations Board v. Pacific Greyhound Lines, Inc., 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838; New Negro Alliance v. Sanitary Grocery Co., 303 U. S. 552, 304 U.S. 542, 58 L.Ed. 703, 82 L. Ed. 1012.

10 Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; Hague v. Committee for Industrial Organization, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093.

Government, superseding, as far as may be deemed expedient, the local law, and exercised by the military commander under the direction of the President, with the express or implied sanction of Congress; while the third may be denominated Martial Law Proper, and is called into action by Congress, or temporarily, when the action of Congress cannot be invited, and in the case of justifying or excusing peril, by the President, in times of insurrection or invasion, or of civil or foreign war, within districts or localities where ordinary law no longer adequately secures public safety and private rights."

■ This is not a case here prosecuted under "military law" as above defined. Yasui holds a commission voluntarily accepted as a Second Lieutenant in the Officers Reserve Corps. By this voluntary surrender of his civilian status under certain circumstances Congress could have made him amenable to military law. But if so, he would have been tried by court martial, under an Act of Congress establishing the "Articles of War".[11] 10 U.S.C.A. § 1471 et seq. An appeal to a civil court erected under the Constitution would be improper.[12] Under the Articles of War, the right of the superior officer to legislate or establish rules and regulations for those under his command is clear. Violations of such orders are made punishable. While it is true this court has held that a civilian can be required to give military service invol- untarily, at the call of his country and while upon induction into the service he becomes subject to military law, until inducted, the civilian does not owe obedience to army orders or proclamations.

Trial by military commission of spies, prisoners of war and civilians attached to the military forces is another exception to the rule that military law does not apply to civilians. In certain instances in case of spies it is recognized as applicable to civilians under the Articles of War.[13] Precedents, furthermore, exist in our history for the trial of spies by military commission whether discovered in a military area or not.[14] These explain the recent action of the Supreme Court of the United States in refusing habeas corpus to persons tried by military commission who had landed surreptitiously on the shores of this country and who were afterward captured in the interior.[15] The fact that those who had some claim to American citizenship were included in the number furnishes no precedent here. An American citizen in service of the enemy who comes through the lines of battle to land here is subject to the laws of war.[16] It is to be noted that citizens residing in this country alleged to have assisted such persons were not tried by military commission but were indicted for treason.[17]

Another exception to ordinary civil rule prevails in war. The military to meet the emergency of the times, where the peril is

---

[11] 41 Stat. 804, 10 U.S.C.A. § 1554.

[12] Smith v. Shaw, 12 Johns. 257; In re Kemp, 16 Wis. 359; Ex parte Goldstein, D.C., 268 F. 431; United States v. McIntyre, 9 Cir., 4 F.2d 823; See In re Egan, 8 Fed.Cas. p. 367, No. 4,303, 5 Blatchf. 319; Ex parte Henderson, 11 Fed.Cas. p. 1067, No. 6,349.

[13] The Articles of War seem to give specific legislative authority for trial by "military Commission" under the situation. See Article 82, 41 Stat. 804, 10 U.S.C.A. § 1554. United States ex rel. Wessels v. McDonald, D.C., 265 F. 754, appeal dismissed 256 U.S. 705, 41 S.Ct. 535, 65 L.Ed. 1180. But see 31 Op. Atty. Gen. 356 and see Arnaud v. United States, 26 Ct.Cl. 370.

[14] The most notable was the case of Major Andre, the English confederate of General Arnold in the Revolution, whose sentence to death by military commission was approved by Washington and executed. See Argument of B. F. Butler, in the Milligan case, supra, 99–101 of 4 Wall., 18 L.Ed. 281, where this and other matters are cited. The broader implications contended for seem to have been there repudiated.

[15] Ex part Quirin, supra.

[16] The doctrines of Ex parte Milligan are not repudiated by the Quirin decision. The Milligan case gives color to the doctrine that a "prisoner of war" can be tried in loyal territory in time of war by military commission. Page 131 of 4 Wall., 18 L.Ed. 281. "We say 'enemy's country' because, under the recognized rules governing the conduct of a war between two nations, Cuba, being a part of Spain, was enemy's country, and all persons, whatever their nationality, who resided there, were, pending such war, to be deemed enemies of the United States, and of all its people." Juragua Iron Company, Ltd., v. United States, 212 U.S. 297, 305, 306, 29 S.Ct. 385, 387, 53 L.Ed. 520.

[17] The indictment and trial of alleged confederates have been reported in the press.

too great to permit certain persons to go at large, are at times forced by the public danger to seize persons, citizen and alien alike, and to hold them and even to transport them long distances. History shows that in such instances the power of the courts has been defied.[18] The rule of force alone is then applied. In the event that habeas corpus is sought, the question of whether this remedy is appositive must be judged under the Constitution and the civil law. If the person has been seized for an indictable offense and the usual processes have been followed, he can be held. It is only when the exercise of the writ has been legally suspended in a given area or the courts have been closed that the military can postpone the application of the fundamental doctrines, unless the particular case fall within the exceptions.

Nor is this a situation where a "military government" could be erected. Oregon is not conquered territory nor hostile country. It is an area, the inhabitants of which are intensely loyal to the United States. In few portions of the country is the population as co-operative in the war effort.

The application of military government in the states of this country has never been made except after the war between the states, when the area of the southern states was treated as territory conquered from a belligerent, and military governments were set up therein.[19] The history of this experiment suggests that it be not repeated.[20]

The present case does not then arise under "military law", nor can it be justified by doctrines relating to trial of military personnel by court martial, nor to trial of spies by military commission nor the seizure and holding of persons by military authority. The instant case relates to the power of the military commander to issue regulations binding indiscriminately upon citizen and alien, reserve officer, spy and civilian. Such power only is tolerated in the first instance if a state of "martial law" has been proclaimed by the proper authority and in the ultimate only if the facts prove the existence of the military necessity therefor.

"But when the military commander controls the persons or property of citizens who are beyond the sphere of his actual operations in the field, when he makes laws to govern their conduct, he becomes a legislator. Those laws may be made actually operative; obedience to them may be enforced by military power; their purpose and effect may be solely to support or recruit his armies, or to weaken the power of the enemy with whom he is contending. But he is a legislator still; and whether his edicts are clothed in the form of proclamations, or of military order, by whatever names they may be called, they are laws. If he have the legislative power conferred on him by the people, it is well. If not, he usurps it. * * * He is not the military commander of the citizens of the United States, but of its soldiers."

"The military power over citizens and their property is a power to act, not a power to prescribe rules for future action. It springs from present pressing emergencies, and is limited by them. It cannot assume the functions of the statesman or legislator, and make provisions for future or distant arrangements by which persons and property may be made subservient to military uses. It is the physical power of an army in the field, and may control whatever is so near as to be actually reached by that force in order to remove obstructions to its exercise." [21]

A military commander under the

<hr>

[18] See Ex parte Merryman, C.C.Md., 17 Fed.Cas. p. 144, No. 9487.

[19] Birkhimer, Military Government and Martial Law, 2d Ed., Chapter XXIII.

[20] President Wilson, in the dark days of another war, when the peril of sabotage and espionage was as great, and the number of citizens of divided loyalty at least as great, expressed strong opposition to the enactment of a statute which would have divided this country into military districts subject to regulations adopted by appropriate military commanders. He wrote to Senator Overman, as follows:

"* * * I am heartily obliged to you for consulting me about the Court-Martial Bill, as perhaps I may call it for short. I am wholly and unalterably opposed to such legislation * * *. I think it is not only unconstitutional, but that in character it would put us nearly upon the level of the very people we are fighting * * *. It would be altogether inconsistent with the spirit and practice of America * * *, I think it is unnecessary and uncalled for. * * *" 8 Baker, Woodrow Wilson, Life & Letters. 100; Chafee Free Speech in the United States, supra, 38, Note 18.

[21] Davis "Executive Power" (October 1862), quoted in Birkhimer's Military Government and Martial Law, 2d Ed., Section 368.

Constitution is given no power of legislation. It follows, therefore, in this case, that the regulations issued by his sole authority, even though it be established that the territory on the Pacific Coast of the United States has been invaded and is in imminent danger of invasion, confer upon the military commander no power to regulate the life and conduct of the ordinary citizen,[22] nor make that a crime which was not made a crime by any act of Congress. The Congress of the United States is in session and consists of the elective representatives of the people. To this body, therefore, alone is committed its ordinary power of passing laws which govern the conduct of citizens, even in time of war.

[redacted] It is true that martial law, when instituted, is complete and represents the arbitrary will of the commander,[23] controlled only by consideration of strategy, tactics and policy and subject only to the orders of the President. Under martial law the commander can seize men and hold them in confinement without trial. He can try them before a military commission for a violation of the laws of war or his own regulations. Finally, he can legislate and bind citizens and others by rules established by him and governing their conduct in the future.[24]

[redacted] Whether declared by the President or by Congress or by the military commander or existing on account of conditions, the only basis for martial law is military necessity.[25]

There is a pernicious doctrine known as "partial martial law", which was developed by an ambitious governor as a method of dictating regulations to the people of a state uncontrolled by the Constitution or

---

22 " * * * the Court concluded that Milligan, not being a part of or associated with the armed forces of the enemy, was a non-belligerent, not subject to the law of war save as—in circumstances found not there to be present and not involved here—martial law might be constitutionally established." Ex parte Quirin, supra, 63 S.Ct. 19, 87 L.Ed. —.

23 See arguments in the Milligan case. It is true as heretofore pointed out, the exercise of will is restrained in the American officer by a sense of ultimate civil responsibility. See Birkhimer, Military Government and Martial Law, 2d Ed., Chapter XIX, which contains an exposition of this attitude. Public opinion in the governed territory is perhaps a restraining force in certain fields, but is not presently a factor here.

24 Under the Organic Act of Hawaii, the Governor, on December 7, 1941, turned the control over to the military, the courts closed to re-open under military direction for certain purposes only and the territory is now completely governed by the military. The necessity there is apparent, but the consequences support the statements above.

Proclamation of defense period, Joseph B. Poindexter, Governor, December 7, 1941.

Proclamation of martial law, Joseph B. Poindexter, Governor, December 7, 1941, Honolulu Star-Bulletin, Dec. 8, 1941.

Proclamation of acceptance of military rule, Lieutenant General Short, December 7, 1941, Honolulu Star-Bulletin, Dec. 8, 1941.

General Orders No. 4, December 7, 1941, Honolulu Star-Bulletin, Dec. 9, 1941.

General Orders No. 29, December 16, 1941, Honolulu Star-Bulletin, Dec. 19, 1941.

General Orders No. 57, January 27, 1942, Honolulu Star-Bulletin, Jan. 30, 1942.

25 Letter President Lincoln to Secretary Chase, September 2, 1863:

"Knowing your great anxiety that the Emancipation Proclamation shall now be applied to certain parts of Virginia and Louisiana which were exempted from it last January, I state briefly what appear to me to be difficulties in the way of such a step. The original proclamation has no constitutional or legal justification except as a military measure. The exemptions were made because the military necessity did not apply to the exempted localities. Nor does that necessity apply to them now any more than it did then. If I take the step, must I not do so without the argument of military necessity, and so without any argument except the one that I think the measure politically expedient and morally right? Would I thus not give up all footing upon Constitution or law? Would I not thus be in the boundless field of absolutism? Could this pass unnoticed or unresisted? Could it fail to be perceived that without any further stretch I might do the same in Delaware, Maryland, Kentucky, Missouri, and Tennessee, and even change any law in any state? Would not many of our own friends shrink away appalled? Would it not lose us the elections, and with them the very cause we seek to advance?"

laws thereof.[26] It constituted an expression of his arbitrary will. The long history within recent years of the use of arbitrary power in the guise of martial law by the executives of the states, sometimes upon the flimsiest pretext,[27] and occasionally, with the unjustifiable support of the judiciary, state[28] and federal, in subversion of the rights and personal liberty of the citizen, indicates that a fear that the state officials might in some future time attempt further violations is at least justifiable.

These perversions of martial rule used by governors of the states in industrial and social conflict to satisfy a personal need for uncontrolled power in given situations, wherein the civil rights of individuals were swept away by legislation or fiat dictated by an individual, indicate that in these trying days of war, limits must be set to military authority exercised in the name of necessity, lest we lose the liberties for which we fight.

"But, it is insisted that the safety of the country in time of war demands that this broad claim for martial law shall be sustained. If this were true, it could be well said that a country, preserved at the sacrifice of all the cardinal principles of liberty, is not worth the cost of preservation." Ex parte Milligan, supra, 4 Wall. 126, 18 L.Ed. 281.

■ The doctrine that there can be a partial martial law, unproclaimed and unregulated except by the rule of the military commander, expressed in orders or regulations proclaimed by him and enforced in the civil courts in a territory within the continental limits of the United States and at the time not occupied by any foreign foe, belongs in the category of such perversions,[29] and cannot be justified by any sound theory of civil, constitutional or military law. Its only justification lies in the doctrines of "state of siege" proclaimed by military commanders, generally speaking, in the governments of Europe. For a state of the United States or any portion thereof to be placed, in any essential function, or for citizens of the United States to be placed with regard to their fundamental rights, subject to the will of the commander alone, however well designed for their protection, without any of the preliminaries above suggested,[30] up to the time when utter necessity requires the abolition of all civil rule for the preservation of the government, would seem to be a complete surrender of the guarantees of individual liberties confirmed in the Constitution of the United States.

The confusion in the authorities seems to arise in a failure to differentiate between a case where martial law is properly declared in *civil disturbances*[31] and a case where the military is called upon to aid the civil power. In the latter case no special attributes[32] should be ascribed either to the soldier or the commander. Ordinary civil law is enforced by a greater power.

"Thus, the war power of the federal government is not created by the emergency of war, but it is a power given to meet that emergency. It is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme co-operative effort to preserve the nation. But even the war power does not remove constitutional limitations safeguarding essential liberties." Home Building & Loan Association

---

26 Governor Allen of Louisiana acting under express directions of Senator Huey Long, N. Y. Times, Aug. 6, 1934, p. 2, col. 6. See Commonwealth ex rel. Wadsworth v. Shortall, 206 Pa. 165, 170, 171, 55 A. 952, 65 L.R.A. 193, 98 Am.St.Rep. 759.

27 See Miller v. Rivers, D.C., 31 F. Supp. 540; Patten v. Miller, 190 Ga. 105, 8 S.E.2d 776; Hearon v. Calus, 178 S.C. 381, 183 S.E. 13; Allen v. Oklahoma City, 175 Okl. 421, 52 P.2d 1054; United States v. Phillips, D.C., 33 F. Supp. 261.

28 State ex rel. Mays v. Brown, 71 W. Va. 519, 77 S.E. 243, 45 L.R.A.,N.S., 996, Ann.Cas.1914C, 1; In re Jones,

71 W.Va. 567, 77 S.E. 1029, 45 L.R.A., N.S., 1030, Ann.Cas.1914C, 31.

29 United States ex rel. Palmer v. Adams, D.C., 26 F.2d 141, 144; Bishop v. Vandercook, 228 Mich. 299, 309, 200 N.W. 278.

30 See Manley v. State, 62 Tex.Cr.R. 392, 137 S.W. 1137; Manley v. State, 69 Tex.Cr.R. 502, 154 S.W. 1008.

31 See Moyer v. Peabody, 212 U.S. 78, 29 S.Ct. 235, 53 L.Ed. 410.

32 Constantin v. Smith, D.C., 57 F.2d 227, 238, 241; Bishop v. Vandercook, supra; Franks v. Smith, 142 Ky. 232, 134 S.W. 484, L.R.A.1915A, 1141, Ann. Cas.1912D, 319; Fluke v. Canton, 31 Okl. 718, 123 P. 1049; Manley v. State, supra, 62 Tex.Cr.R. 400, 137 S.W. 1137.

v. Blaisdell, supra, 290 U.S. 426, 54 S.Ct. 235, 78 L.Ed. 413, 88 A.L.R. 1481.

The replacement of the statutes of Congress, the courts and civil authority in this area can then be effected only by "martial law proper", under the definitions given. What then is the test? The court in the Milligan case says:

"It follows, from what has been said on this subject, that there are occasions when martial rule can be properly applied. If, in foreign invasion or civil war, the courts are actually closed, and it is impossible to administer criminal justice according to law, *then,* on the theatre of active military operations, where war really prevails, there is a necessity to furnish a substitute for the civil authority, thus overthrown, to preserve the safety of the army and society; and as no power is left but the military, it is allowed to govern by martial rule until the laws can have their free course. As necessity creates the rule, so it limits its duration. * * * And so in the case of a foreign invasion, martial rule may become a necessity in one state, when, in another, it would be 'mere lawless violence.'" Ex parte Milligan, supra, 4 Wall. 127, 18 L.Ed. 281.

The concurring opinion did not controvert this holding. The concurring judges gave support to this doctrine, but held that Congress if the necessity were legislatively found, could declare martial law, as could the President under given circumstances. It was vital to find whether *"martial law proper"* prevailed in Indiana for the determination of the case. If it prevailed, whether declared by Congress or the President, or in existence because of military necessity, a citizen could have been tried by military commission, although he was neither prisoner of war, spy, a resident of enemy country nor attached to the military forces. Otherwise, he could not. The recital by the court of the facts shows that the peril was extreme,[33] but held that martial law was not in effect.

No designation need be given to acts which the military sometimes are required to commit under the stress of war and of military necessity, such as the arrest and ejection of a federal judge from his lines by Andrew Jackson,[34] the refusal of General Cadwalader under Lincoln's order to obey the writ of the federal circuit court,[35] the seizure of Vallandigham,[36] of Milligan.[37] The fact that a conscientious commander commits such acts at times to perform his mission does not always render them lawful. The power to suspend the writ of habeas corpus is given, so that a civil court cannot pass on legality of such acts in time of public danger. The rule of the commander is the rule of force. He may have the physical power to seize, to hold, to confine the individual and to disobey the orders of the court. It may be his military duty. Whether he has made himself civilly responsible for illegal acts can only be tried after the event, when the rule of force has ended. But such acts, however necessary, establish no doctrine of qualified martial law and are, in instances, unjustified by law.

But it is too clear for debate that martial law does not come into existence under constitutional government until utter necessity compels the investment of one man with the power of life and death over citizen and soldier alike in a given area.[38] It is the law of self-defense among nations. Like self-defense, it is a use of elemental force sanctioned by common law, initiated solely by stark necessity and van-

---

[33] "Open resistance to the measures deemed necessary to subdue a great rebellion, by those who enjoy the protection of government, and have not the excuse even of prejudice of section to plead in their favor, is wicked; but that resistance becomes an enormous crime when it assumes the form of a secret political organization, armed to oppose the laws, and seeks by stealthy means to introduce the enemies of the country into peaceful communities, there to light the torch of civil war, and thus overthrow the power of the United States. Conspiracies like these, at such a juncture, are extremely perilous; and those concerned in them are dangerous enemies to their country

* * *." Ex parte Milligan, supra, 4 Wall. 130, 18 L.Ed. 281.

[34] See Ex parte Milligan, supra, 4 Wall. 52, 18 L.Ed. 281.

[35] Ex parte Merryman, supra.

[36] Ex parte Vallandigham, 28 Fed.Cas. page 874, No. 16,816.

[37] Ex parte Milligan, supra.

[38] In Hawaii at the present time, pursuant to a proclamation of martial law, military commissions for violations of the laws of the United States or the Territory or the "rules, regulations, orders or policies of the military authorities" adjudge punishment commensurate with the offense committed and "may adjudge the death penalty in appropriate cases". Gen-

ishing when the necessity no longer exists.[39] If military necessity does not exist, neither the declaration of war nor the proclamation of martial law can justify acts contrary to ordinary law.[40] On the other hand, where there is no declaration of martial law by Congress or the President or by the General in this area, and when there has not even been a suspension of the writ of habeas corpus, there is a strong implication that in the judgment of the political authorities no necessity justifying such action exists.

■ While a war is in progress, the question of whether military necessity requires the closing of the courts and the abrogation of civil authority for the time being and in a certain area, is one for the political or executive departments of the government. There should be a clear line of demarcation drawn by the political agencies between government by fiat, and by law.

■ The existence of military necessity is justiciable under a particular set of circumstances. In the event the military commander has taken measures under the guise of martial law when the military necessities did not actually require, he has been held civilly liable after the war is finished.[41] But it is obvious during the clash of arms the evidence of the military necessities cannot be adduced in a civil court. Therefore, such a tribunal should not be called at that time to declare whether the necessity exists.[42] When the Congress in session has not declared martial law and the President has not recognized the existence of martial law by executive order closing the courts and even the military commander has not proclaimed martial law is in effect, a court cannot take the responsibility in view of the clear declaration of the Supreme Court of the United States that a martial law is not in effect unless the courts are closed. While it is true that neither a declaration of the President,[43] nor of Congress,[44] nor of the military commander[41] would be binding upon a court eventually, if the necessity did not exist, until some political or military authority has faith enough in the position to proclaim a state of martial law, a court which is in fact open, should not find the existence of necessity as a fact.

■ All this points to the vital inconsistency here developed between the action taken by the civil authorities in a federal court bound by and acting under the guarantees of the Constitution of the United States and its amendments, and the claim that a military necessity has arisen so vital that its exigencies demand that citizens of the United States be confined to their places of lodging at hours dictated by a military commander. If such an emergency exist, and it may well be that it does, the Congress of the United States or the Executive, in the months since Pearl Harbor, could have declared martial law or at least suspended the writ of habeas corpus in view of the situation. If the emergency exist, the military commander may be justified in seizing the body of Yasui and removing him from the military areas or zones. Of a certainty, if the military commander can allow a civil court to remain open to try violations of his orders, without support by force, military necessity cannot be so imperative that the fundamental safeguards must be abandoned. So long as the courts of the United States are open, these tribunals are bound by Constitution and treaties of the United

---

eral Order No. 4, Honolulu Star-Bulletin, Dec. 9, 1941.

[39] Ex parte Milligan, supra.

[40] Sterling v. Constantin, supra.

[41] The bright star in the crown of Andrew Jackson was the fact that although justly flushed with triumph at New Orleans, he paid a fine in the federal court, because he had arrested the judge thereof upon the ground that the latter was interfering with the military security of his force. Actually, at the time of the ejection, peace had been proclaimed and, therefore, the military necessity did not exist. Jackson apparently recognized that he had no legal right to act on appearances where the fact did not justify action. He was brought into court on a charge of contempt before the same judge, who fined him. Jackson paid the fine.

The apologists cite the fact, that Congress subsequently made Jackson whole for this expenditure in the last year of his life and after he had been twice President of the United States, as an argument for the existence of the power to act without sanction of actual necessity. See arguments Ex parte Milligan, supra, 4 Wall. 52, 94–97, 18 L.Ed. 281.

[42] See Consolidated Coal & Coke Co. v. Beale, D.C., 282 F. 934, where it is said that a court cannot make a determination in advance that troops are necessary to quell an insurrection.

[43] See Sterling v. Constantin, supra.

[44] See Ex parte Milligan, supra.

States and legislation of Congress. The proclamations or regulations of a military commander cannot be enforced by such tribunals.[45]

But it is contended that there was an adoption of the proclamations of the military commander because the act of Congress passed three days earlier prescribed penalties for acts done in violation of the regulations issued with reference to certain areas or zones. Congress itself could not make constitutionally a distinction relating to the conduct of citizens based on their color or race.[46] Such an intention is not to be found inadvertently.[47] Congress itself could not in loyal territory uninvaded make acts of citizens criminal simply because such acts were in violation of orders to be issued in the future by a military commander.[48] Congress could have declared martial law and thereupon the courts might have become adjuncts or agencies of the General commanding. Under these circumstances he might have had the power to legislate by regulation and create classes of citizens.

There are valid reasons for control of citizens of Japanese ancestry, but the test is color and race. An equally valid foundation can be found for control of persons of Italian, German[49] and Irish ancestry. A real basis in necessity might be found in the imposition of such regulations upon the eastern frontier after the landing of persons of German ancestry who were harbored in this country. But the history of this country contains too many examples of loyalty of persons of foreign extraction to justify any blanket treatment. The precedent, if valid, can be made to justify exile or detention of any citizen whom a military commander desires in a loyal state not under threat. If the military necessity existed and martial law was actually in effect, justification might be pleaded.

There are suggestions that control by curfew or detention or exile of civilians as to a given area interferes with a lower order of rights than the right to life. Such doctrine sounds strange in this country, with schoolbook memories of Jefferson's doctrine of revolution and Patrick Henry's preference for death.

This court, while not operating as an adjunct of a military commander, must apply ordinary law and protect the rights of a citizen in a criminal case. If Congress attempted to classify citizens based upon color or race and to apply criminal penalties for a violation of regulations, founded upon that distinction, the action is insofar void.

The power of Congress, however, during time of war over aliens of a country which is hostile to the United States is almost plenary,[50] as is that of the President by a series of acts dating to the foundation of the Union.[51] While in ordinary times such persons are entitled to the "equal protection of the laws", when their country is at war with the United States, Congress or the President may intern, take into custody, restrain and control all enemy aliens within the territorial limits of the United States,[52] and neither are restrained

---

[45] Marshall, C. J., says in considering a motion for a writ of habeas corpus in Ex parte Bollman, 4 Cranch 75, 8 U.S. 75, 93, 2 L.Ed. 554, where petitioner was charged with treason, "As preliminary to any investigation of the merits of this motion, this court deems it proper to declare that it disclaims all jurisdiction not given by the constitution, or by the laws of the United States. * * * Courts which are created by written law, and whose jurisdiction is defined by written law, cannot transcend that jurisdiction."

[46] See Railroad Retirement Board v. Alton R. Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468; opinion of the present Chief Justice, Hague v. Committee for Industrial Organization, supra, 307 U.S. 519, 59 S.Ct. 954, 83 L.Ed. 1423. See, also, Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220; Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16,

62 L.Ed. 149, L.R.A.1918C, 210, Ann. Cas.1918A, 1201.

[47] "The issue is fraught also with great international significance in terms of our relations with colored peoples generally." McWilliams, "Moving the West-Coast Japanese", Harper's Magazine, September, 1942, Vol. 185, No. 1108, pages 359, 369.

[48] Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947.

[49] The literature of the last World War contains abundant proof.

[50] See Act April 16, 1918, C. 55, 40 Stat. 531, 50 U.S.C.A. § 21.

[51] Act July 6, 1798, c. 66, Secs. 1, 2, 3, 1 Stat. 577, R.S. Secs. 4067–4070, 50 U.S.C.A. §§ 21–24.

[52] In 1813 upon petition for habeas corpus, the executive order requiring enemy aliens who were within 40 miles of tide-

by any constitutional guarantees from such action.[53] While the orders of General De-Witt, therefore, were void as respects citizens, unquestionably from the history of the proclamations, Congress would be well on notice that the General might intend to establish regulations relating to enemy aliens within the areas designated by the previous proclamations. The regulations, which make these acts crimes, by adoption thereof by act of Congress are thus valid with respect to aliens.

The only question now for the court to determine is as to whether Yasui, the defendant, is a citizen or an enemy alien.

Under the Constitution of the United States, Amend. 14, § 1, Yasui, by virtue of his birth in the territorial limits of the United States and notwithstanding the fact that his parents were alien Japanese incapable of naturalization in the United States, had conferred upon him the inestimable right to citizenship in the United States.[54] By international law, however, he was also a citizen of Japan and subject of the Emperor of Japan. According to international law, also, he had, upon attaining majority but not before, the right of election as to whether he would accept citizenship in the United States or give his allegiance to the Emperor [55] to whom he was bound by race, the nativity of his parents and the subtle nuances of traditional mores engrained in his race by centuries of social discipline.

While, therefore, Congress might have set up tests or presumptions whereby the initiation or continuance of the relationship of citizenship in persons who held the dual status during minority might have been tested, as it has done in case of naturalized citizens, or might have permitted segregation until evidence of citizenship were produced, no such intention is apparent in the legislation.

This election is a mental act.[56] The choice which exists in the mind of a person is exemplified by acts. The intention, however, to make an election can be discovered by a tribunal as can criminal intent, knowledge or any other mental state. Notwithstanding the expression of some liberal authorities, tender in times of peace to preserve civil rights, such a mental state may be found in a criminal case contrary to the sworn evidence, protestations and declarations of a defendant.

The evidence in this case shows that during the minority of the defendant he made with his parents a trip to Japan when he was about nine years old and remained there during the summer vacation, visiting his grandfather, who was a resident of Japan and a subject of the Japanese Emperor. He attended a Japanese language school in the United States and apparently became proficient in speaking the Japanese language, which he testified was used to considerable extent in his own home. His further education was in the public schools and in the University of Oregon, where ' he received both an arts and a law degree. During the time that he was taking his arts course at the University, he took the course in military training prescribed and, unquestionably, compulsory. Therefore, upon his graduation with acceptable standards he received

water to .retire beyond that limit was upheld. Lockington's Case, Brightly, N. P., Pa., 269; Lockington v. Smith, C.C. Pa.1848, Fed.Cas.No.8448, Pet.C.C. 466; 50 U.S.C.A. § 21, p. 11.

[53] De Lacey v. United States, 9 Cir., 249 F. 625, L.R.A.1918E, 1011; Minotto v. Bradley, D.C.Ill., 252 F. 600; Halpern v. Commanding Officer, D.C., 248 F. 1003. See, also, Deutsch-Australische, etc., v. United States, 59 Ct.Cl. 450. See Proclamation No. 1364, April 6, 1917.

[54] United States v. Wong Kim Ark, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890.

[55] Perkins, Secretary of Labor v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320. Perkins, Secretary of Labor v. Elg, 99 F.2d 408; In re Arla Marjorie Reid, D.C., 6 F.Supp. 800; United States v. Reid, 9 Cir., 73 F.2d 153.

[56] "In cases of double allegiance, the child when he becomes of age 'is required to elect between the country of his residence and the country of his alleged technical allegiance. Of this election two incidents are to be observed; when once made it is final, and it requires no formal act, but may be inferred from the conduct of the party' from whom the election is required.'" Moore International Law Digest, Volume III, pages 545, 546, Section 430. Mr. Porter, Acting Secretary of State to Mr. Winchester, Minister to Switzerland, September 14, 1885, For. Rel. 1885, 811.

See Banning v. Penrose, D.C., 255 F. 159, 161, where considering a case of a person who had become naturalized here and returned to the country of his nativity, "It is a question more of intention than anything else.".

a commission as Second Lieutenant in the Officers Reserve Corps, and upon acceptance thereof, took the oath of allegiance to the United States.

Such acts were all during minority and, although they may indicate tendencies, are not evidence of the election to accept citizenship in the United States or allegiance to the Japanese Emperor. After his majority, he continued in residence in this country, a circumstance which all agree raises an inference that he intended to claim citizenship here. He likewise testified that he voted in the elections, which is another factor inviting attention. It must be remembered, however, that he was still a student in the University of Oregon and received his degree in 1939. Residence for the purpose of education does not ordinarily contain any inference as to intended domicile or citizenship.

 The record shows that the father of the defendant was decorated by the Emperor of Japan. Within a few months after Yasui had been admitted to the Bar of the State of Oregon, he was, at the instigation of his father, employed by the Consulate General of Japan at Chicago.

While so employed, Yasui followed the orders of the Consulate General of Japan and made speeches, setting forth the philosophy and purposes of the military caste of Japan as propaganda agent for the Emperor. While in this position, he was registered twice by the Consulate General as a propaganda agent for a foreign power, pursuant to the regulations issued by the State Department of the United States. It is true that he testifies that there was an American citizen named Murphy, presumably not of Japanese extraction, who was employed in the same work, but we are not concerned here with the employment of Murphy or his purposes or the innocence of his intention. Obviously, he had no election to make. The question before the court is as to what election Yasui made.

Yasui remained as a propaganda agent until after the declaration of war by this country against Japan and after the treacherous attack by the armed forces of Japan upon territory of the United States in the Islands of the Pacific.

The court thus concludes from these evidences that defendant made an election and chose allegiance to the Emperor of Japan, rather than citizenship in the United States at his majority. The court concludes that he served the purposes and philosophy of the ruling caste of Japan as a propaganda agent because he could speak English, and only resigned when it seemed apparent that he could no longer serve the purposes of his sovereign in that office, but could do better execution in the event he could be commissioned an officer in the armed forces of the United States on active service.

Since Congress provided for the punishment of persons violating the proclamations of the commanding officers, and since Yasui is an alien who committed a violation of this act, which included by reference the regulations of the commander referring to aliens, the court finds him guilty.